THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ECOMMERCE MARKETERS ALLIANCE, INC. DBA ECOMMERCE INNOVATION ALLIANCE; FLUX FOOTWEAR, LLC; and STODGE, INC. DBA POSTSCRIPT, | § § § § § § | |
| *Plaintiffs*, | § § | CIVIL ACTION NO. 1:25-cv-1401 |
| vs. | § § | |
| STATE OF TEXAS; KEN PAXTON, in his official capacity as Attorney General of Texas; and JANE NELSON, in her official capacity as Texas Secretary of State, | § § § § § § § | |
| *Defendants*. | § | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      Texas Senate Bill 140 (2025) ("SB 140") made changes, effective September 1, 2025, to Chapter 302 of the Texas Business & Commerce Code.  The result is a law that is unconstitutional, unlawful, and unenforceable and that puts unreasonable burdens on businesses that send text messages to individuals who have consented to receive them.  Plaintiffs seek preliminary and permanent injunctions prohibiting Defendants from enforcing the registration, reporting, and disclosure requirements contained in Texas Business & Commerce Code Chapter 302 against Plaintiffs (including all members of the Ecommerce Marketers Alliance, Inc. dba Ecommerce Innovation Alliance) that operate consent-based text messaging campaigns.

2.      SB 140 was adopted to add text messages to the reach of Chapter 302, which previously applied only to telephone calls.  According to its sponsors, SB 140 had a laudable goal: protect consumers from "*unwanted* and unsolicited text messages" by extending the reporting and disclosure requirements of Chapter 302 to "*unwanted* text messaging peddlers."  (emphasis added)  This Complaint does *not* seek to undermine that goal.  Indeed, Plaintiffs support efforts to curb abusive scam and spam text messages that consumers do not want to receive.

3.      Unfortunately, SB 140 goes further than its drafters intended and has the potential to put businesses that text only with the consent of their customers on the hook for hundreds of thousands of dollars in litigation expenses and damages, not to mention potential criminal liability.  Under the new language of Chapter 302, businesses can only avoid these Draconian results by undertaking an extremely burdensome registration process and making lengthy disclosures in their text-messaging campaigns.  These disclosures may make sense for voice calls but are impractical in the context of character-limited text messages.  As a result, and as Plaintiffs will demonstrate, these burdens violate the well-established contours of the First Amendment's protections for commercial speech as set forth in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980), and its progeny.

4.      Chapter 302 does contain two potentially relevant exceptions that could serve as a basis for concluding that SB 140 is not an unconstitutional infringement on commercial speech for businesses sending consent-based text messages.  But both exceptions are too vague to survive judicial review, thus rendering all of Chapter 302 void for vagueness.

5.      As a result, Plaintiffs and the members of EIA, all of whom only send texts to those who have consented to receive them, all face the imminent threat of prosecution (both civilly and criminally) by the Texas Attorney General, the risk of immediate lawsuits by opportunistic class-

action lawyers seeking to exploit the overly broad provisions of Chapter 302, and the real possibility of incurring crippling sanctions and penalties that could literally put them out of business and put tens of thousands of employees on the street. They should not have to wait to be sued or prosecuted in order to raise the clear constitutional defects in Chapter 302 as amended. Accordingly, they have filed this action to prevent through injunctive and declaratory relief the trampling of their First Amendment rights and the potential destruction of their businesses.

## PLAINTIFFS

6.      Plaintiff Ecommerce Marketers Alliance, Inc. dba Ecommerce Innovation Alliance ("EIA") is a nonprofit corporation organized under the laws of the State of Florida. Its principal place of business is in Richmond, Virginia.

7.      Plaintiff Flux Footwear, LLC ("Flux") is a limited liability company organized under the laws of the State of Texas. Its principal place of business is in Benbrook, Texas

8.      Stodge Inc. dba Postscript ("Postscript") is a corporation organized under the laws of the State of Delaware. Its principal place of business is in Arizona.

## STANDING

### A.      EIA's Standing

9.      EIA was formed in 2023. EIA members are generally ecommerce businesses based in the United States or technology vendors that directly support them. EIA members operate consent-based text messaging programs. That is, EIA members send text messages only to customers who have visited their online stores and who have provided explicit consent to receive marketing messages by text, generally because they want to receive discounts or other incentives (*e.g.*, 20% off their first purchase) when they enroll in SMS marketing campaigns.

10.      As reflected in EIA's Articles of Incorporation:

> The Corporation is organized and shall be operated exclusively for purposes of promoting the common interests of the ecommerce industry, within the meaning of Section 501(c)(6) of the Internal Revenue Code, or the corresponding section of any future federal tax code (the "Code"), including, but not limited to:
>
> (1) advocacy for laws, regulations, and standards that reconcile public interests with technological advances in ecommerce marketing; and
>
> (2) formation of and advocacy for, ecommerce marketing industry best practices for compliant and customer conscious mobile marketing.

11.    EIA's biggest area of focus is helping ecommerce companies navigate the ever-evolving landscape of telemarketing laws and regulations at both the federal and state levels.

12.    Since its founding, EIA has been actively engaged in the legislative process to address unintended consequences from state and federal laws that impact ecommerce businesses. Among other things, EIA seeks to address the surge in costly lawsuits against ecommerce businesses acting in good faith and with consumer consent that are routinely brought by serial plaintiffs and opportunistic law firms to exploit technicalities or ambiguities in consumer-protection statutes.

13.    EIA meets the test for associational standing. *See Nat'l Religious Broadcasters v. FCC*, 138 F.4th 282, 290 (5th Cir. 2025) ("To establish associational standing, an association must show that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.").

14.    First, one or more of EIA's members would have standing to assert a claim in their own right. Second, the interests that EIA seeks to protect are germane to its purposes. Finally, neither the claim asserted nor the relief requested requires the participation of a member, especially since EIA seeks only prospective relief. *See Nat'l Religious Broadcasters*, 138 F.4th at 290-91

("[T]he participation of individual association members is not normally necessary when an association seeks prospective or injunctive relief for its members.").

**B.    Flux's Standing**

15.    Flux was originally founded in 2020, combining the forces of a former Reebok designer and a successful entrepreneur to develop a new brand of athletic shoes designed to help the world move better.  The current legal entity was formed in Texas in May 2023.

16.    Flux is an ecommerce business that sells its products to consumers through its online store on a nationwide basis.  Flux has operated its online store and consistently sold its products under that name for a period of more than two years.

17.    Flux's website (https://fluxfootwear.com/) allows customers browsing the site to get 20% back on their first purchase when they sign up to receive text messages:



18.    Flux has nearly 200,000 customers who have asked to receive its text messages, including many who registered with telephone numbers having Texas area codes.  An estimated

9% to 10% of Flux's total SMS subscribers are residents of Texas.  Flux generates a significant portion of its revenue by sending text messages to new and existing subscribers who have opted in to receive SMS messages from the company.

19.    Flux faces the imminent threat of civil and criminal prosecution under Chapter 302 as amended.  Absent injunctive relief, Flux's only path to avoiding that threat would be to comply with the unconstitutional registration, reporting, and disclosure requirements that, through the 2025 amendments to Chapter 302, have been expanded to reach Flux's business activities.

**C.**    **Postscript's Standing**

20.    Postscript is a leading text message marketing platform that helps ecommerce businesses send text messages to consumers who have visited ecommerce websites and provided their consent to receive those messages.  Postscript serves more than 26,000 ecommerce businesses across the country, nearly all of which are small and mid-sized companies.

21.    Postscript estimates that between 9% and 10% of all messages sent through the Postscript platform are sent to individuals residing in Texas.

22.    Compliance is core to Postscript's product and strategy.  As a founding member of EIA, Postscript champions common-sense ecommerce policies.   Each of the more than 26,000 merchants utilizing Postscript's platform has agreed to "obtain[ ] consent from [their] End Users . . . for . . . sending text messages" and to comply with "CTIA Policies."[1]  CTIA is a national association of wireless carriers, including AT&T, T-Mobile, and Sprint.  CTIA publishes Messaging Principles and Best Practices ("CTIA Messaging Principles").[2]   Under the CTIA

---

[1]    https://postscript.io/terms-of-service

[2]    https://www.ctia.org/the-wireless-industry/industry-commitments/messaging-interoperability-sms-mms

Messaging Principles: "to maintain Consumer confidence in messaging services," businesses sending consumer text messages agree to:

- Obtain a Consumer's consent to receive messages generally;

- Obtain a Consumer's express written consent to specifically receive marketing messages; and

- Ensure that Consumers have the ability to revoke consent.

*Id.* at § 5.1.

23.     Postscript works closely with CTIA and wireless carriers to ensure that merchants using the Postscript platform are complying with the consent requirements.  For example, carriers and agents acting on behalf of the carriers can conduct audits of messaging programs.  Postscript itself regularly employs measures intended to ensure that its customers are only sending text messages to consumers who have provided prior consent.  If it learns that a customer is using the platform in a manner that does not comport with the consent requirements, Postscript requires consumer telephone numbers to be removed from the system and/or terminates the merchant's access to the platform.

24.     Postscript is not a "seller" as that term is defined in Section 302.001(5) of the Texas Business and Commerce Code and may not be under any obligation to itself meet the registration requirement under Chapter 302.  But Postscript does assist "sellers" in the transmission of consent-based text messages and is thus arguably a "salesperson" as defined in Section 302.001(4).  As a "salesperson," Postscript could be potentially liable under Section 302.252 if it were to continue to provide services to those of its customers who are not registered under Chapter 302.

25.     Moreover, each of EIA's 26,000 customers faces the imminent threat of civil and criminal prosecution under Chapter 302 as amended.  Unless enforcement of Chapter 302 is

enjoined as requested herein, its enforcement against Postscript's customers would in turn cause irreparable injury to Postscript itself.

26.     Finally, Postscript has standing due to the potential that it could be construed to be a "seller" subject to Chapter 302's unconstitutional registration, reporting, and disclosure requirements.

## DEFENDANTS

27.     The State of Texas is the real party in interest as Defendant in this action.

28.     Defendant Ken Paxton is the Attorney General of the State of Texas. He is a resident of Travis County, Texas. Attorney General Paxton is sued only in his official capacity as the state official responsible for enforcement of Texas Business & Commerce Code Chapter 302 as modified by SB 140.

29.     Defendant Jane Nelson is the Secretary of State of Texas.   She is a resident of Travis County, Texas.  Secretary of State Nelson is sued only in her official capacity as the state official responsible for administering the telemarketing registration program in Texas Business & Commerce Code Chapter 302 as modified by SB 140.

## JURISDICTION AND VENUE

30.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331.  The Court has the authority to issue a declaratory judgment under 28 U.S.C. § 2201. The Court has authority to issue injunctive relief under Federal Rule of Civil Procedure 65.

31.     This Court has personal jurisdiction over Defendants Paxton and Nelson because they reside in and/or conduct a substantial portion of their official business in Austin, Texas.

32.     Venue is appropriate in this district and division under 28 U.S.C. § 1391(b)(1) and (b)(2).

## FACTUAL BACKGROUND

33.     In 1991, Congress adopted the Telephone Consumer Protection Act ("TCPA"), which is implemented under regulations of the Federal Communications Commission. The TCPA and its implementing regulations, among other things, impose consent requirements for marketing text messages sent to consumers utilizing automatic telephone dialing systems. The TCPA also created the national Do-Not-Call registry, which permits consumers to register their phone numbers and to request that they not be subject to telemarketing calls or text messages without their consent. The TCPA includes a private right of action and provides that individuals may recover $500 per violation or three-times that amount for "willful" violations.

34.     Following the U.S. Supreme Court's decision in *Facebook v. Duguid*, 592 U.S. 395 (2021), which narrowed the definition of an "automatic telephone dialing system" under the TCPA, a number of states enacted their own telemarketing laws, sometimes referred to as "mini-TCPA" laws. Some mini-TCPA laws are more expansive than the federal statute.

35.     Texas has enacted its own mini-TCPA laws, including Chapter 302, Chapter 304, and Chapter 305 of the Texas Business and Commerce Code.

36.     Chapter 302, before the 2025 amendments, effective September 1, 2025, and subject to certain exemptions, required those making non-exempt "telephone solicitations" from Texas locations or to purchasers located in Texas to register with the Texas Secretary of State, to obtain a registration certificate, and to make detailed and burdensome reports and disclosures.

37.     Chapter 304, for its part, called for the creation of a Texas No-Call List and prohibited "telemarketers" from making "telemarketing calls" to telephone numbers published on that list. It also established requirements for those engaged in making "facsimile solicitations" and prohibited "telemarketers" from interfering with caller-identification services or devices.

38.     Chapter 305 prohibited the making of a "telephone call," for the purpose of "making a sale," to a telephone number that the maker of the call knew or should have known "is a mobile telephone for which the called person will be charged for that specific call."  It also imposed certain restrictions on facsimile transmissions.

39.     Chapters 302, 304, and 305, before the 2025 amendments, each provided for civil and criminal penalties against those violating their requirements, although the penalty provisions were not uniform in all respects.

40.     Prior to the 2025 amendments, there were also differences among the three chapters with respect to consent and text messages.  Before the 2025 amendments, text messages were *not* among the solicitations covered by Chapters 302 or 305, but certain text messages were expressly covered by Chapter 304.  Chapter 302, before the 2025 amendments, did *not* have any exception for solicitations made to purchasers who had consented to receive them, while Chapters 304 and 305 did have express exceptions that made their requirements and prohibitions inapplicable to certain solicitations that recipients had consented to receive.

41.     In the 2025 legislative session, amendments were made to Chapters 302, 304, and 305.  The amendments appear to have been motivated, in large part, to make more uniform the application of these mini-TCPA laws to text messages and to harmonize their treatment of consent given by those receiving telemarketing solicitations.   The amendments were made through adoption of Senate Bill 140.

42.     Senator Bob Hall filed Senate Bill 140 on November 12, 2024.  In the Statement of Intent submitted on February 13, 2025, Senator Hall made clear that the bill was designed to address the disparity between Chapter 302 and Chapter 304 with respect to the treatment of text messages.  As Senator Hall pointed out: "The Chapter 304 definition of a 'telephone call' includes

text messaging.  However, Chapter 302 does not define 'telephone call' and does not contemplate text messaging."

43.     When discussing SB 140 at a hearing of the Senate Committee on Business and Commerce on February 18, 2025, Senator Hall again made clear that the intent of the bill was to address "*unauthorized* text messaging," noting that because of the difference in definitions in Chapter 302 and Chapter 304, Chapter 302 did not currently apply to text messages.   *See* https://senate.texas.gov/videoplayer.php?vid=21145&lang=en at 48:38. (emphasis added).

44.     Senator Hall again spoke to the bill when it was up for passage on the Senate Floor on March 11, 2025.  Here again, Senator Hall made clear his intent for the legislation, noting that "consumers are not adequately protected against *unauthorized* calls or *unauthorized* text messages under Chapter 302" and telling his colleagues that if they voted for the bill, "your constituents will be protected from *unwanted* calls and texts."  *See* https://senate.texas.gov/videoplayer.php?vid=21272&lang=en at 26:46.  (emphasis added).

45.     When a public hearing on the bill was held before the House Trade, Workforce, and Economic Development Committee on May 7, 2025, Representative Anchia spoke to the bill. His language mirrored that of Senator Hall.  He told his colleagues that SB 140 was about "*unwanted* text messaging" and "*unwanted* text messaging peddlers," and he told the story of a case in which a Texas consumer had received "thousands of *unsolicited* text messages a day," but could not seek redress under Chapter 302 because the definition of telephone calls in that statute did not include text messages.  *See* https://house.texas.gov/videos/22022 at 1:00:37.  (emphasis added).

46.     It is thus clear that Senator Hall and Representative Anchia had two narrow (but laudable) goals for SB 140: (a) to bring Texas consumers protection that did not then exist against

certain text-message solicitations, but (b) to apply those protection only to "unwanted" texts, meaning those to which the recipient had *not* consented.

47.    Initially, SB 140 was narrowly drafted to meet these twin goals.  As originally introduced, the full text of SB 140 looked like this:

> SECTION 1.   Section 302.001, Business & Commerce Code, is amended by adding Subdivision (6-a) to read as follows:
> (6-a)    "Telephone call" has the meaning assigned by Section 304.002.

> SECTION 2.   This Act takes effect September 1, 2025

* * * * *

48.    This narrow articulation of the amendment would have easily accomplished the first goal of bringing certain text messages within the scope of Chapter 302.   The pre-amendment version of Chapter 302 already imposed registration requirements on certain "telephone calls," but left that term undefined.  The narrow amendment in the original version of SB 140 would have simply added to Chapter 302 the definition of "telephone call" already set forth in Chapter 304.  This would have added certain text messages to the reach of Chapter 302 because the definition of "telephone call" in Chapter 304 includes, not just "calls," but also "other transmissions" made to or received at a telephone number, including "a transmission made of a text . . . to a mobile telephone number."  Tex. Bus. and Com. Code § 304.002(10).

49.    This narrow articulation of the amendment, by virtue of an exception set forth in Chapter 304's definition of "telephone call," would also have served the second goal of limiting Chapter 302's reach to "unwanted" text messages.   After generally defining "telephone call" to include text messages, the Chapter 304 definition goes on to except "transmissions" to a "mobile telephone number" that the telephone service customer "has agreed . . . to receive."  *Id.* In other

12

words, unwanted texts are "telephone calls" under the Chapter 304 definition, but texts sent with the recipient's consent are not.

50.     Thus, had SB 140 been enacted as originally filed by Senator Hall, *unwanted* text messages would have been brought within Chapter 302's reach; texts sent to those who consented to receiving them would have remained outside the scope of Chapter 302; and the constitutional problem this case addresses would have been avoided.

51.     But, at the May 14, 2025 meeting of the House Trade, Workforce & Economic Development Committee, a substitute version of SB 140 was introduced by Committee Chair Angie Button.

52.     The substitute bill added some changes to Chapters 304 and 305 that are not relevant here.  But, it also made a change to Chapter 302, beyond that contained in Senator Hall's original version of SB 140, that had the effect of sweeping texts sent with the consent of the recipient back into Chapter 302's reach.

53.     To understand the problem, it is important to note the critical role that, before SB 140, the definition of "telephone call" played in assessing Chapter 302's reach.  Before SB 140, Chapter 302's registration and disclosure requirements applied to a "seller," a term defined to mean "a person making a telephone solicitation."  "Telephone solicitation," in turn, was defined to mean a "telephone call" made for certain purposes.  So, to assess whether someone had to register under Chapter 302, it was essential to determine whether they were making "telephone calls" within the meaning of Chapter 302.

54.     Had SB 140 been enacted as originally filed by Senator Hall, unwanted text messages would have become covered (by virtue of the incorporation of Chapter 304's initial definition of "telephone call"), but text messages sent upon consent would have remained outside

the scope of Chapter 302 (by virtue of the incorporation into Chapter 302 of the exception from Chapter 304's definition of "telephone call" for texts sent to a customer who has "agreed . . . to receive the transmission"). This follows because, under SB 140 as originally proposed by Senator Hall, those sending unwanted text messages would be engaging in "telephone solicitation" (thus triggering registration, reporting, and disclosure requirements), but those sending consented-to text messages would not be engaging in "telephone solicitation."

55.    The substitute bill introduced on May 14, 2025, dramatically (though perhaps unintentionally) changed the result. A side-by-side comparison of SB 104 as filed in November 2024 by Senator Hall to the substitute version filed on May 14, 2025, by Chair Button will help show how this happened:

| SENATOR HALL'S VERSION | SUBSTITUTE VERSION |
| --- | --- |
| SECTION 1.    Section 302.001, Business & Commerce Code, is amended by adding Subdivision (6-a) to read as follows:<br><br>(6-a)    "Telephone call" has the meaning assigned by Section 304.002. | SECTION 1.    Section 302.001, Business & Commerce Code, is amended by adding Subdivision (6-a) and amending Subdivision (7) to read as follows:<br><br>(6-a)    "Telephone call" has the meaning assigned by Section 304.002. |
| SECTION 2.    This Act takes effect September 1, 2025 | (7) "Telephone solicitation" means a [telephone] call or other transmission, including a transmission of a text or graphic message or of an image, initiated by a seller or salesperson [initiates] to induce a person to purchase, rent claim, or receive an item.  The term includes a telephone call a purchaser makes in response to a solicitation sent by mail or made by any other means. |

60.    The substitute bill introduced by Chair Button operated in part to add to subsection 7's definition of "telephone solicitation" the following language: "including a transmission of a text or graphic message or of an image."  If that had been the only addition made by the substitute

14

bill, it would have been, while unnecessary, at least not inconsistent with Senator Hall's desire in the original version of SB 140 to incorporate Chapter 304's definition of telephone call into Chapter 302 as the means to include *unwanted* texts, but not texts sent with consent, within the scope of Chapter 302.

61.    But, the substitute bill went further and, as the following quote shows, struck the word "telephone" from the first line of the definition of "telephone solicitation": "Telephone solicitation" means a [~~telephone~~] call." The substitute bill thereby severed the link between the definition of "telephone solicitation" and the definition of "telephone call" that would have existed under the original version of SB 140. The substitute bill thereby wrote out of the statute the exception for texts sent to those who had "agreed . . . to receive the transmission."

62.    By striking the word "telephone" from the first line of the definition of "telephone solicitation," the substitute version of SB 140 made application of the registration and disclosure requirements of Chapter 302 turn on whether a seller makes "calls," as opposed to "telephone calls." This change effectively rendered meaningless the incorporation into Chapter 302 of Chapter 304's definition of "telephone call," since (with the deletion of the word "telephone" from the first line of the definition of "telephone solicitation") there is no other place in Chapter 302 where the phrase "telephone call" has any operative impact.

63.    Given this drafting history, it seems highly likely that the striking of the word "telephone" from the first line of the definition of "telephone solicitation" was an inadvertent scrivener's error not intended to sweep texts sent with consent back into the scope of Chapter 302. If that had been the intent, one would expect that change to have been highlighted in subsequent discussions of the bill, but that never happened.

64.    Indeed, when Representative Anchía introduced the substitute bill on the House floor on May 26, 2025, he told his House colleagues that "[t]his bill that Sen. Hall has drafted seeks to address an issue that gives us all universal and bipartisan animosity, and that is scam calls and messages."  He stated that the bill was "so that you do not get more telephone calls, texts, and messages that are *unwanted* and *unsolicited*."   *See*  http://house.texas.gov/videos/22297  at 13:36:58.  (Emphasis added.)

65.    In other words, even after the substitute version of SB 140 was introduced, statements regarding its purpose and impact—to regulate the sending of "unwanted" text messages—continued to echo those that had been made with respect to Senator Hall's original version of SB 140.

66.    At no time did any member of the legislature indicate in the public record that SB 140 would impact companies that send text messages with consent.

67.    EIA and the other Plaintiffs did not learn of the bill, and therefore did not understand its impact, until after the substitute bill was introduced and adopted by the House Trade, Workforce & Economic Development Committee, passed by the Texas House of Representatives, and consented to by the Senate.  No public hearing was held on the substitute bill before it was fully adopted.

68.    In sum, while the sponsors of SB 140 repeatedly represented that the bill was intended to only impact *unwanted* text messages, the language in Chapter 302 is not so limited.  Instead, no "seller may [ ] make a telephone solicitation from a location in this state or to a purchaser located in this state unless the seller holds a registration certificate for the business location from which the telephone solicitation is made."  Texas Business & Commerce Code § 302.101(a).  A "seller" is any "person who makes a telephone solicitation on the person's own

behalf," and a "telephone solicitation," as amended by SB 140, "means a call or other transmission, including a transmission of a text or graphic message or of an image, initiated by a seller or salesperson to induce a person to purchase, rent, claim, or receive an item." Texas Business & Commerce Code § 302.001(5). Further, purchaser is defined broadly to include "a person who: (A) is solicited to become or becomes obligated for the purchase or rental of an item; or (B) is offered an opportunity to claim or receive an item." *Id.* at § 302.001(3).

69.     Similarly, any time "a telephone solicitation is made," the seller is required to make a variety of disclosures to a "purchaser." *Id.* at § 302.202. Thus, as a result of SB 140, businesses sending commercial text messages to any person located in Texas, including those who have visited the business's website and asked to receive those messages, must comply with all of the disclosure requirements in every text message they send.

70.     Thus, as amended by SB 140, Chapter 302 requires any business sending a text message for the purpose of inducing a person to purchase, rent, claim, or receive an item to comply with Chapter 302's registration, reporting, and disclosure requirements irrespective of whether or not the recipient consented to the text message.

71.     Violating either Chapter 302's registration requirements or its disclosure requirements when sending a marketing text message to a purchaser located in Texas creates significant risk for any business. Chapter 302 sets forth five potential penalties.

72.     First, the Attorney General may bring an action to seek injunctive relief. Texas Business & Commerce Code § 302.301.

73.     Second, "[a] person who violates this chapter is subject to a civil penalty of not more than $5,000 for each violation." Texas Business & Commerce Code § 302.302(a). While civil penalties are typically obtained by the government and not private individuals, *see State v.*

*Emeritus Corp.*, 466 S.W.3d 233, 247 (Tex. App.—Corpus Christi 2015), courts have treated the $5,000 civil penalty in § 302.302 as a statutory damages provision akin to the TCPA's $500 statutory damages. Private litigants have thus been allowed to collect $5,000 for each violation of Chapter 302.  *See, e.g.*, *Guadian v. United Tax Def. LLC*, No. EP-23-CV-00349-KC, 2024 U.S. Dist. LEXIS 6572, at *15-19 (W.D. Tex. Jan. 12, 2024); *Thomas v. Zenith Solar, LLC*, No. MO:22-CV-00047-DC-RCG, 2022 U.S. Dist. LEXIS 202851, at *9 (W.D. Tex. Aug. 1, 2022); *Thompson v. Dealer Renewal Servs.*, No. 4:21-cv-0467-P, 2021 U.S. Dist. LEXIS 223424, at *5-6 (N.D. Tex. Nov. 18, 2021).

74.    Third, a violation is treated as a deceptive trade practice subject to enforcement under Chapter E of the Texas Deceptive Trade Practices Act.  Texas Business & Commerce Code § 302.303.  The DTPA includes a private right of action and provides for the recovery of attorneys' fees.  Tex. Bus. & Com. Code § 17.50.

75.    Fourth, an individual may be able to seek recovery against the $10,000 surety that the seller was required to provide as part of the registration process.  Texas Business & Commerce Code § 302.304.

76.    Fifth, a person who knowingly violates certain parts of Chapter 302 may be found guilty of a Class A misdemeanor.  Texas Business & Commerce Code § 302.251.  A class A misdemeanor is punishable by a fine of up to $4,000 and a year in jail.  Texas Penal Code § 12.21.

77.    Imposition of these penalties on Plaintiffs—or complying with registration, reporting, and disclosure requirements to avoid them—would impermissibly burden Plaintiffs' constitutional right to engage in commercial speech and would cause them irreparable injury for which they would have no adequate remedy at law.

## COUNT I: 42 U.S.C. § 1983
## (COMMERCIAL SPEECH)

78.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

79.    Plaintiffs bring this Count I under 42 U.S.C. § 1983 for violation of the First Amendment to the United States Constitution, as incorporated against the States through the Fourteenth Amendment, because the registration, reporting, and disclosure requirements of Chapter 302 of the Texas Business and Commerce Code, as amended in 2025, impermissibly burden commercial speech.

80.    The First Amendment to the U.S. Constitution provides that the government "shall make no Law . . . abridging the Freedom of Speech. . . ." U.S. Const. amend. I. The protections of the First Amendment have been incorporated against the States through the Due Process Clause of the Fourteenth Amendment to the Constitution.

81.    As the Texas Supreme Court recognized in *Pruett v. Harris County Bail Bond Board*, 249 S.W.3d 447, 456 (Tex. 2008), when speech is "commercial in nature," it "must be constitutionally gauged under the Supreme Court's analysis in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*." 249 S.W.3d at 456. "Commercial speech is generally afforded less constitutional protection than other forms of constitutionally guaranteed expression. The government may ban misleading or deceptive commercial speech, as well as speech that relates to illegal activity." *Id.* (citations omitted). But when "the commercial speech is neither illegal nor misleading, the government's power is more circumscribed. For the rules to withstand constitutional scrutiny, (1) the [government] must assert a substantial interest that the solicitation restrictions are designed to achieve, (2) the restrictions must directly or materially advance that interest, and (3) the restrictions must be 'narrowly drawn' —they cannot survive if the interest . . . could be served as well by a more limited restriction." *Id.* (citations omitted). "The

government bears the burden not only to demonstrate that the harms it seeks to avoid are real, but that its restriction 'will in fact alleviate them to a material degree.' This requirement is critical, else 'a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression.' The Supreme Court has declined to uphold regulations that 'only indirectly advance the state interest involved.'" *Id.* at 458 (first quoting *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993); and then quoting *Central Hudson*, 447 U.S. 557, 564(1980)).

82.    The Fifth Circuit recently summarized the analysis undertaken by a court to determine whether state laws infringe protected commercial speech as follows:

> First, the court "must determine whether the expression concerns lawful activity and is not misleading." Second, the court asks "whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest."

*Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 283 (5th Cir. 2024) (citations omitted) (quoting *Central Hudson*, 447 U.S. at 566).

83.    Registration under Chapter 302 is extremely burdensome and costly. Registration is performed by completing the form prescribed by the Secretary of State. https://www.sos.state.tx.us/statdoc/forms/3401.pdf. The form requires the disclosure of details such as:

    a.    the name, address, date of birth of each officer;

    b.    bylaws or governing documents for the company;

    c.    street addresses for the company;

    d.    each telephone number being used for telemarketing;

    e.    the name and principal residence address of each salesperson;

f.   the criminal, civil litigation, and bankruptcy history of every officer or director, as well as any person in charge of any location of the business;

g.   wage information for each salesperson;

h.   information regarding the business's financial institutions;

i.   a description of each and every item being sold;

j.   sales literature for each and every product; and

k.   if the seller does not manufacture the product, information regarding the manufacturer.

84.   In certain circumstances, companies are required to disclose highly sensitive commercial information about their suppliers, including the identity of their manufacturers, contracts with their suppliers, and information about the prices they pay their suppliers.

85.   Despite the sensitive nature of the information required by the Secretary of State, including home addresses and wage information for salespeople, all information included on the registration form or attached to a registration statement is "public information." Tex. Bus. & Com. Code § 302.102(b).

86.   In addition, companies completing the registration process are required to pay a $200 registration fee and obtain either a bond, a certificate of deposit, or a letter of credit in the amount of $10,000.  Tex. Bus. & Com. Code § 302.106; Tex. Bus. & Com. Code § 302.107.

87.   Platforms like Postscript, which help to facilitate the transmission of text messages on behalf of brands, are typically protected from liability under the TCPA under a "common carrier" exception unless heavily involved in the content of the messages.  *See, e.g.*, *Rinky Dink, Inc. v. Elec. Merch. Sys.*, No. C13-1347-JCC, 2015 U.S. Dist. LEXIS 22108, at *12 (W.D. Wash. Feb. 24, 2015) ("The TCPA does not apply to common carriers. The TCPA was intended to 'apply

to the persons initiating the telephone call or sending the message and. . . not to the common carrier. . . that transmits the call or messages and that is not the originator or controller of the content of the call or message.'" (citations omitted)).

88.    However, Chapter 302 creates a different test, exempting only "a person subject to the control or licensing regulations of the Federal Communications Commission." *See* Tex. Bus. & Com. Code § 302.053(6).  This creates a substantial ambiguity for a Software-as-a-Service platform like Postscript, which operates as a common carrier, but does not have to be licensed by the FCC. *Rinky Dink*, 2015 U.S. Dist. LEXIS at *14 ("Common carriers need not be officially recognized by the FCC.").  Therefore, Chapter 302 also creates significant risk for Postscript, which serves more than 26,000 ecommerce companies.

89.    If Chapter 302 was determined to require Postscript to provide information regarding each of its 26,000 customers, compliance would be impossible.  Those 26,000 ecommerce brands each operate separate websites that potentially sell hundreds of individual products.  Compiling and providing the required information about each of its customers, and each of their products, and then maintaining that information would require far more resources than Postscript has available.

90.    Once a business has registered, the burden does not end there.  These registration requirements are not one-time obligations; they must be updated with every material change, and the volume and specificity of the information required is exceptionally high.

91.    Further, a business sending commercial text messages to anyone located in Texas is also required to comply with onerous disclosure requirements.  Section 302.202 requires these disclosures to be made whenever a "telephone solicitation is made," which means each time a marketing text message is sent:

22

**Sec. 302.202.  DISCLOSURES REQUIRED BEFORE PURCHASE.**
When a telephone solicitation is made and before consummation of any sales transaction, a seller shall provide to each purchaser:

(1)  the complete street address of the location from which the salesperson is calling the purchaser and, if different, the complete street address of the seller's principal location;

(2)  if the seller represents or implies that a purchaser will receive without charge a specified item or one item from among designated items, regardless of whether the items are designated as gifts, premiums, bonuses, prizes, or otherwise:

(A)  the information required to be filed by Sections 302.153(b)(4) and (5)(A) and (B), as appropriate; and

(B)  the total number of individuals who have actually received from the seller during the preceding 12 months the item having the greatest value and the item with the smallest odds of being received;

(3)  if the seller is offering to sell an interest in an oil, gas, or mineral field, well, or exploration site, the information required by Section 302.153(h); and

(4)  if the seller represents that an item is being offered at a price below that usually charged for the item, the name of the item's manufacturer.

92.    Compliance with these disclosure requirements would include the disclosure of sensitive information, including potentially a salesperson's home address (if members of the company's marketing department work from home), as well as the manufacturer of any items that are promoted as sale items.

93.    Text messages contain 160 characters.  Plaintiffs estimate that, in addition to the brand's marketing text, it could take an additional two messages just to comply with the mandatory disclosure requirements. Thus, if it was possible to isolate Texas consumers—which it is not— Texas consumers would suddenly be bombarded with a series of 3 or more text messages each and every time a business sent them a marketing text message that they had requested to receive.

94.     Because businesses pay for each text message they deliver, including fees to wireless carriers, the disclosure requirements would double or triple the costs they incur to message Texas consumers.

95.     Rather than protecting Texas consumers from unwanted messages, Chapter 302's disclosure requirements will create the opposite outcome.  In turn, many more consumers will be annoyed and revoke consent, thus no longer receiving the discounts and promotions they asked to receive.

96.     And, to make matters worse, Chapter 302 prohibits businesses from explaining that these disclosures are being compelled by the State.  Tex. Bus. & Com. Code § 302.203.  Thus, consumers will never understand why they are being inundated with repetitive, unhelpful disclosures.

97.     SB 140's imposition of the registration, reporting, and disclosure requirements on companies who send commercial text messages only to individuals who have provided prior consent violates the First Amendment as applied to Plaintiffs because it is an unconstitutional infringement on protected commercial speech by the State.  The law cannot survive this as-applied challenge based on the factors set forth in *Central Hudson*.

98.     As to the **first factor**, there are no allegations and no reasonable basis on which to conclude that ecommerce companies sending marketing text messages to consumers who request to receive them are engaged in unlawful activity or speech that is deceptive or misleading.  *Free Speech Coal.*, 95 F.4th at 283.  Therefore, under *Central Hudson*, the State cannot prohibit the speech entirely.

99.     As to the **second factor**, while the State bears the burden of demonstrating the interest, Plaintiffs do not dispute that the State meets this prong of the *Central Hudson* test.  Here,

24

the Texas legislature repeatedly stated that the purpose of SB 140 is to protect consumers from "unauthorized text messaging," "thousands of unsolicited text messages," and "telephone calls, texts, and messages that are unwarranted and unsolicited." Further, Texas Business & Commerce Code § 304.005 states the purpose of the statute is to "protect persons and the public against false, misleading, abusive, or deceptive trade practices in the telemarketing business." Thus, protecting Texans from unsolicited and unauthorized text messages and calls is presumably the substantial interest that will be articulated by the State.

100.    Chapter 302's registration requirements fail, however, the third and fourth factors of the *Central Hudson* test.

101.    Under the **third factor**, "[a] governmental body seeking to sustain a restriction on commercial speech must demonstrate that . . . its restrictions will in fact alleviate [the harms] to a material degree." *Free Speech Coal.*, 95 F.4th at 283-84.

102.    The State cannot meet this burden with regard to Chapter 302. As a purely logical matter, international businesses that are sending spam and scam messages into the United States are not going to comply with the registration and disclosure requirements imposed by SB 140 on text messages.

103.    Further, domestic bad actors, whose conduct violates a variety of existing federal laws, are not reasonably likely to engage in the registration process. There is no basis to conclude that imposing these registration and disclosure requirements on companies that obtain consent before sending text messages will stop other companies from sending unwanted and harmful text messages. In practice, Chapter 302 does nothing more than impose burdens on the good actors; it does little to stop the bad actors.

104.    The **fourth factor** requires the State to prove that the restrictions are narrowly drawn.  In previous cases addressing this final prong of the *Central Hudson* test, the Supreme Court has "made clear that if the Government could achieve its interests in a manner that does not restrict speech, or that restricts less speech, the Government must do so."  *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 371(2002).

105.    The State cannot satisfy the fourth prong of *Central Hudson* because the law requires registration by all businesses sending marketing text messages to persons located in the State of Texas, even if those persons have consented to receiving those messages.  The restrictions are not narrowly drawn to impact only unwanted or unsolicited text messages or to address false, misleading, abusive, or deceptive text messages.

106.    Because Chapter 302's registration, reporting, and disclosure requirements do not meet the requirements of *Central Hudson*, they are an unconstitutional infringement of commercial speech.  Chapter 302, as amended by SB 140, irreparably harms Plaintiffs.  Therefore, Chapter 302, as amended by SB 140, should be declared unconstitutional and enjoined.

## COUNT II: 42 U.S.C. § 1983
## (VAGUENESS AS TO PURCHASER LOCATION)

107.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

108.    Plaintiffs bring this Count II under 42 U.S.C. 1983 for violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution because Chapter 302 of the Texas Business and Commerce Code, as amended in 2025, is unconstitutionally vague in its purported application to "a purchaser located in the state."

109.    "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). "The vagueness doctrine is a component of the

Constitution's due process guarantee." *Canales v. Paxton*, No. 03-19-00259-CV, 2020 Tex. App. LEXIS 7941, at *8-9 (Tex. App. Sep. 30, 2020).  A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); *King Street Patriots v. Tex. Democratic Party*, 521 S.W.3d 729, 743 (Tex. 2017) ("When persons of common intelligence are compelled to guess a law's meaning and applicability, the law violates due process and is invalid.").

110.    "When a statute implicates First Amendment rights, the law must be sufficiently definite to avoid chilling protected expression." *Ex parte Paxton*, 493 S.W.3d 292, 305 (Tex. App.—Corpus Christi 2016); *Accounting Outsourcing, LLC v. Verizon Wireless Pers. Commc'ns., L.P.*, 329 F. Supp. 2d 789, 805 (M.D. La. 2004) ("[B]ecause the TCPA regulates constitutionally protected commercial speech, it must satisfy a more rigid vagueness test, such that even one impermissible application would render the TCPA vague.").  Thus, in the free-speech context, "stricter standards of permissible statutory vagueness" apply to laws that have a "potentially inhibiting effect on speech." *Smith v. California*, 361 U.S. 147, 151 (1959). Therefore, "vagueness may be grounds for a pre-enforcement challenge insofar as [a law] chills protected speech under the First Amendment"—even if the law is not vague in every application. *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 n.32 (5th Cir. 2024).

111.    The scope of speech regulated by Chapter 302, as amended by SB 140, is unclear because it prohibits sending any marketing text messages to a "purchaser located in this state unless the seller holds a registration certificate for the business location from which the telephone solicitation is made."  Texas Business & Commerce Code § 302.101(a).  Businesses, however,

have no reliable method of determining whether a purchaser will be located in Texas at the time a text message will be delivered.

112.    It is technically impossible for a business who has received the telephone number from an individual consenting to receive text messages to determine where that person will be physically located when a text message is delivered.  The FCC considers real-time location data highly sensitive personal information and has fined wireless carriers hundreds of millions of dollars for sharing that location data with third-parties.  Those fines were recently upheld against Sprint and T-Mobile in the D.C. Circuit.  S*print Corp. v. FCC*, _ F.4th _, 2025 U.S. App. LEXIS 20862 (D.C. Cir. 2025).  Therefore, it is not possible for businesses to know in advance of sending messages whether the Texas registration and disclosure requirements apply to them.

113.    Consumers can travel anywhere at any time with their mobile phones and, with number portability, consumers now often keep their phone numbers when moving to different parts of the country.  Area codes do not accurately reflect a subscriber's current location and no longer even reflect whether an individual resides in a particular state.  This means businesses engaged in SMS marketing efforts lack a reliable legal means to know where a mobile subscriber is physically located before a text message is transmitted to that subscriber.

114.    While area codes are not reliable indicators of a phone's physical location, at least one state nevertheless addressed the ambiguity in their state mini-TCPA laws by providing that a business can safely rely on area codes to determine whether or not the law is applicable.  *See* Or. Rev. Stat. § 646.563(2) (as amended by Oregon HB 3865) (eff. Jan. 1, 2026) ("For the purpose of complying with the requirements of this section, a person may rely on the area code of a telephone number for a mobile telephone to determine whether the telephone number is for a party located in this state.").  Chapter 302 contains no such provision.

115.    Because Texas law does not provide fair notice of what text messages are impacted by the registration and disclosure requirements, and because of the impact that this lack of clarity will have on lawful commercial speech, Chapter 302, as amended by SB 140, is unconstitutionally vague and irreparably harms Plaintiffs.  Therefore, Chapter 302, as amended by SB 140, should be declared unconstitutional and enjoined.

**COUNT III: 42 U.S.C. § 1983**
**(VAGUENESS AS TO STATUTORY EXEMPTIONS)**

116.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

117.    Plaintiffs bring this Count III under 42 U.S.C. § 1983 for violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution because Chapter 302 of the Texas Business and Commerce Code, as amended in 2025, is unconstitutionally vague in its purported creation of exemptions for texts to "current or former customers" and texts sent from "retail establishments."

118.    Chapter 302 incorporates ten different exemptions.  Texas Business & Commerce Code §§ 302.052-302.061.  If a business can meet the burden of proving an exemption applies to it, then the business can use it as a defense in civil or criminal proceedings.  *Id.* § 302.051.

119.    There are three exemptions that could, in theory, be interpreted to protect Plaintiffs. All three, however, are unconstitutionally vague and fail to provide adequate notice regarding whether they apply to Plaintiffs and EIA's members.

120.    The first exemption is Section 302.058, which provides that a seller who is "soliciting business from a former or current customer" and which "has operated under the same business name for at least two years" is exempt from Chapter 302.

121.    This exemption renders the statute unconstitutionally vague because the critical word in this exemption, "customer" is not defined in the statute.  Instead, the statute defines the

word "purchaser," which means, among other things, a person who "is solicited to become or becomes obligated for the purchase or rental of an item." Texas Business & Commerce Code § 302.001(3).

122. The word "customer" is subject to multiple different meanings and a person of common intelligence would therefore have to guess at the scope of the statute as limited by this exception.

123. For example, "customer" could mean a person who visits a store but does not purchase anything, compare Customer, Dictionary.com, https://www.dictionary.com/browse/customer (last visited Sep. 1, 2025) (including various definitions of customer, including "Informal. a person one has to deal with"); *with Customer*, Merriam-Webster, https://www.merriam-webster.com/dictionary/customer (last visited Sep. 1, 2025) (providing both "patron" and "guest" as synonyms for customer).

124. In normal usage, "customer" commonly refers to individuals who are prospective purchasers, such as a person who comes to a store to browse, even if they have not yet completed a purchase. For example, a manager might ask a sales clerk to check on the "customer" who just came in the door. This usage, if applied in the context of online sales, would certainly mean that individuals who have taken the additional step of affirmatively consenting to receive text messages on the merchant's website fit within the "customer" exception.

125. However, courts have found that a "customer" is a person who has made a purchase. *See, e.g.*, *RigUp, Inc. v. Sierra Hamilton, LLC*, 613 S.W.3d 177, 188 (Tex. App.—Austin 2020) (reviewing dictionary definitions but holding that "customer" means "one that purchases a commodity or service"); *Spain v. ManPow, LLC*, No. 02-24-00154-CV, 2025 Tex. App. LEXIS

3033, at *23 (Tex. App.—Fort Worth May 1, 2025) ("Merriam-Webster defines 'customer' as 'one that purchases a commodity or service'").

126.    Thus, an individual of reasonable intelligence might interpret "customer" as used in the statute as a person who completed a purchase or as any person who visited a business.

127.    Because "customer" is undefined, the statute fails to put businesses on notice as to whether a solicitation to an individual who visits a business, but does not complete a purchase, is prohibited by the statute.

128.    The second exemption is Texas Business & Commerce Code § 302.059.  It provides an exemption for "Persons Who Make Certain Sales Presentations or Make Sales at Established Retail Locations," and specifically provides an exemption for a "person who for at least two years, under the same name as that used in connection with the person's telemarketing operations, has operated a retail establishment where consumer goods are displayed and offered for sale continuously, if a majority of the person's business involves buyers obtaining services or products at the retail establishment."

129.    This exemption also renders the statute unconstitutionally vague because the critical phrase in this exemption, "retail establishment," is not defined in the statute.  The question then is whether a company that sells its good entirely online can meet the requirement of making sales at "a retail establishment"?

130.    This phrase is vague because it "may be reasonably interpreted in either of two ways."  *State v. Ross*, 573 S.W.3d 817, 822 (Tex. Crim. App. 2019).  A person of common intelligence could reasonably interpret retail establishment to require a physical store or could interpret it to include online retail stores.

131.    Because "retail establishment" is undefined, the statute fails to put businesses on notice as to whether a solicitation by a business that operates an online retail store, but not a physical store, is prohibited by the statute.

132.    The third exemption is relevant to Postscript.  That exemption is Texas Business & Commerce Code § 302.060, which provides in relevant part that "This chapter does not apply to a person: (1) who provides telephone solicitation services under contract to a seller; (2) who has been operating continuously for at least three years under the same business name; and (3) for whom at least 75 percent of the person's contracts are performed on behalf of other persons exempt from the application of this chapter under this section." Because the exemptions set forth in Sections 302.058 and 302.059 render the scope of the statute vague, it is impossible for Postscript to know whether 75 percent of its contracts are with merchants that are exempt from Chapter 302.

133.    While Postscript cannot ascertain how many messages it has sent to individuals "located in Texas," it does know that in a 365-day period it sent more than 1 billion lawful text messages to subscribers with Texas area codes on behalf of its more than 26,000 customers.  Thus, if the "customer" and "retail establishment" exceptions were to be applied in a manner that exposed Postscript to liability, Postscript could have more than $13 billion dollars of exposure every day solely for not registering with the Secretary of State.

134.    Because Texas law does not provide fair notice of whether it applies to either (1) solicitations to consumers who have consented to receive text messages; or (2) to solicitations from online retailers, and because of the impact that this lack of clarity will have on lawful commercial speech, Chapter 302, as amended by SB 140, is unconstitutionally vague and

irreparably harms Plaintiffs.  Therefore, Chapter 302, as amended by SB 140, should be declared unconstitutional and enjoined.

## COUNT IV: EQUITABLE RELIEF

135.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

136.    For the reasons discussed above, Chapter 302 of the Texas Business & Commercial Code, as amended by SB 140, violates the First Amendment and Due Process Clauses of the Constitution and thereby deprive Plaintiffs and EIA's members of enforceable rights.

137.    Unless declared unlawful and enjoined, Chapter 302 of the Texas Business & Commercial Code, as amended by SB 140, will chill protected speech and cause Plaintiffs and EIA's members irreparable harm for which they will have no adequate remedy at law.

138.    This Court can and should exercise its equitable power to enter preliminary and permanent injunctions precluding Defendants from enforcing Chapter 302 as amended.

## COUNT V: DECLARATORY RELIEF

139.    Plaintiffs incorporate all proceeding paragraphs as though fully set forth herein.

140.    Plaintiffs are entitled to declaratory relief on all claims identified.

141.    In any "case of actual controversy within its jurisdiction," a federal court "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

142.    This Court can and should enter a declaration that the challenged provisions of Chapter 302, as amended by SB 140, are unconstitutional and otherwise unlawful.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.      Declare that the registration, reporting, and disclosure requirements in Chapter 302, as amended by SB 140, are unconstitutional and unlawful as applied to Plaintiffs and EIA's members;

B.      Preliminarily and permanently enjoin Defendants and their respective agents, employees, and persons acting at their direction or control from taking any action to enforce Chapter 302, as amended by SB 140, against Plaintiffs, including EIA's members;

C.      Enter judgment in favor of Plaintiffs;

D.      Award Plaintiffs their attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful claims against state officials;

E.      Award Plaintiffs all other such relief as the Court deems just and proper.

DATED: September 1, 2025                    Respectfully submitted,


                                           MCGUIREWOODS LLP

                                           By: */s/ Thomas M. Farrell*
                                           Thomas M. Farrell
                                           Texas Bar No. 06839250
                                           tfarrell@mcguirewoods.com
                                           845 Texas Ave., Suite 2400
                                           Houston, TX 77002
                                           (713) 353-6677 / (832) 214-9933 (Fax)

                                           Matthew A. Fitzgerald
                                           mfitzgerald@mcguirewoods.com
                                           Gateway Plaza
                                           800 East Canal Street
                                           Richmond, VA  23219-3916
                                           (804) 775-4716 / (804) 698-2251 (Fax)
                                           PRO HAC FORTHCOMING

                                           Hannah K. Caison
                                           hcaison@mcguirewoods.com
                                           Fifth Third Center
                                           201 N. Tryon St.
                                           Suite 3000
                                           Charlotte, NC 28202
                                           (704) 343-2000 / (704)343-2300 (Fax)
                                           PRO HAC FORTHCOMING

                                           *ATTORNEYS FOR PLAINTIFFS*