# EXHIBIT C

Docusign Envelope ID: 774CE8D9-854E-4EEB-9A2D-0775BBB213E7

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| ECOMMERCE MARKETERS ALLIANCE, INC. DBA ECOMMERCE INNOVATION ALLIANCE; FLUX FOOTWEAR, LLC; and STODGE, INC. DBA POSTSCRIPT,<br><br>*Plaintiffs*,<br><br>vs.<br><br>STATE OF TEXAS; KEN PAXTON, in his official capacity as Attorney General of Texas; and JANE NELSON, in her official capacity as Texas Secretary of State,<br><br>*Defendants*. | CIVIL ACTION NO. 1:25-cv-01401-RP |

## DECLARATION OF ALEX BELLER

I, Alex Beller, declare as follows:

1. My name is Alex Beller. I am the President of Stodge Inc. dba Postscript ("Postscript"). I am over 21 years of age. I am competent to make this Declaration. I have personal knowledge of all statements of facts set forth below, and all such statements are true and correct.

2. Postscript is a corporation organized under the laws of the State of Delaware. Its principal place of business is in Arizona.

3. Postscript is a leading text message marketing platform that helps ecommerce businesses send text messages to consumers who have visited ecommerce websites and provided their consent to receive those messages. Postscript serves more than 16,000 active ecommerce businesses across the country, the vast majority of which are small and mid-sized companies.

4. Postscript estimates that between 9% and 10% of all messages sent through the Postscript platform are sent to individuals with a Texas area code phone number.

5. Compliance is core to Postscript's business strategy. Postscript is a founding member of Ecommerce Marketers Alliance, Inc. d/b/a Ecommerce Innovation Alliance ("EIA"). EIA is trade association acting on behalf of ecommerce businesses. Through its membership in EIA and otherwise, Postscript champions common-sense ecommerce policies.

6. Each of the more than 16,000 active merchants utilizing Postscript's platform is an EIA member and has agreed to "obtain[ ] consent from [their] End Users . . . for . . . sending text messages" and to comply with CTIA policies.

7. CTIA is a national association of wireless carriers, including AT&T, T-Mobile, and Verizon. CTIA publishes Messaging Principles and Best Practices ("CTIA Messaging Principles").

8. Under the CTIA Messaging Principles: "to maintain consumer confidence in messaging services," businesses sending consumer text messages agree to: (1) obtain a consumer's consent to receive messages generally; (2) obtain a Consumer's express written consent to specifically receive marketing messages; and (3) ensure that consumers have the ability to revoke consent.

9. Postscript works closely with CTIA and wireless carriers to ensure that merchants using the Postscript platform are complying with the consent requirements. For example, carriers and agents acting on behalf of the carriers can conduct audits of messaging programs. Postscript itself regularly employs measures intended to ensure that its customers are only sending text messages to consumers who have provided prior consent. If it learns that a customer is using the platform in a manner that does not comport with the consent requirements, Postscript requires

consumer telephone numbers to be removed from the system and/or terminates the merchant's access to the platform.

10. Postscript is aware that Chapter 302 of the Texas Business and Commerce Code was amended, effective September 1, 2025, to bring certain text messages within its scope and to require businesses making certain solicitations by text message to register with the Texas Secretary of State and to make certain disclosures. Postscript did not become aware of Senate Bill 140, which effected these changes, until after it was enacted into law.

11. Postscript understands from a review of the legislative history of Senate Bill 140 that it was primarily intended to bring *unwanted* texts within the scope of Chapter 302. However, the language of SB 140, as finally adopted, could be read to cover text messages sent to those who asked to receive them and are thus not in any sense unwanted by the recipient.

12. To the extent Chapter 302 as amended by SB 140 covers text messages sent to purchasers located in Texas who consented or asked to receive them, it would impact all or virtually all of Postscript's more than 16,000 active customers. Each of those customers, as noted, only sends texts to those who have consented to receive them. Each of them, moreover, almost certainly sends text messages to purchasers located in Texas (although, as discussed below, there is no way of knowing where the recipient of a particular text message will be located upon receipt of that message).

13. Postscript's services to our customers include ensuring, to the extent possible, that SMS campaigns comply with applicable laws and regulations. Postscript is currently unsure whether Postscript itself must register with the Texas Secretary of State and is similarly uncertain on how to advise its customers on whether they are required to register.

14. Postscript's uncertainty arises from three separate portions of Chapter 302.

15. First, it is not clear whether Postscript and Postscript's customers are within the scope of Section 302.058. That section says that Chapter 302 "does not apply" to a person who "(A) is soliciting business from a former or current customer and (B) has operated under the same business name for at least two years." Because the term "customer" is not defined in Chapter 302, it is not clear whether and to what extent Postscript and Postscript's clients meet the first condition of this exception. Postscript and Postscript's clients only send texts to consumers who have first visited their websites and who have agreed to receive recurring auto-dialed text messages of a marketing nature. Is such a person a "customer" upon its initial visit to a website or does that person only qualify as a "customer" after making an initial purchase? The answer to that question is not clear, since in common usage "customer" sometimes refers to someone who has made an actual purchase and sometimes refers to someone who has merely visited a place of business without having made an actual purchase.

16. Second, it is not clear whether Postscript and Postscript's clients qualify for the exception set forth in Section 302.59. That section says that Chapter 302 "does not apply" to a "person who for at least two years, under the same name as that used in connection with a person's telemarketing operations, has operated a retail establishment where consumer goods are displayed and offered for sale continuously, if a majority of the person's business involves buyers obtaining services or products at the retail establishment." For most of Postscript's clients, a majority of their business involves buyers obtaining products or services at their websites. Thus, if their websites are deemed "retail establishments," as used in Section 302.59, it would appear that Chapter 302 would not apply to them. That said, the word "establishment" is not defined in the statute. And, since in common usage "establishment" could refer to either a brick-and-mortar

4

physical location or to a website, Postscript cannot tell whether its clients fall within the scope of Section 302.59.

17. Third, Postscript is uncertain on the extent to which Section 302.101 could apply, if at all, to text messages that Postscript or its clients send. That section requires registration by a seller before the seller can make a "telephone solicitation" to "a purchaser located in this state." Postscript and its clients do not have access to real-time location data showing where a mobile phone is located at any given time. In fact, I understand that it would be illegal for Postscript or its clients to obtain such information. Consumers with Texas area codes may or may not live in Texas. Consumers who do live in Texas, moreover, frequently bring their mobile phones with them when they travel outside of the state. Thus, Postscript and its clients have no way of knowing, when a particular text message is sent on a particular day to a particular purchaser, whether it is being sent to a purchaser "located in this state."

18. I have reviewed the registration and disclosure requirements in Chapter 302. In my view, it would be extremely burdensome and expensive for Postscript and Postscript's clients to comply with those requirements.

19. Attached as Exhibit 1 to this Declaration is the form the Texas Secretary of State has issued for registration under Chapter 302. It is my understanding that, in addition to filing this form upon initial registration, Section 302.105 requires the filing of an addendum at the end of every quarter and the filing of a separate addendum every time there is any material change in the information submitted with the initial registration form. If applied to Postscript or Postscript's clients, these requirements would be extremely burdensome and expensive, in part because the form requires detailed information about the specific products that a registrant sells, including a description of each product; a copy of all sales information and literature for each

product; a copy of all written material sent to purchasers; the name, address, and telephone number, by product, of each of the registrant's suppliers; the address of each location where products are kept before they are delivered to purchasers; the name and owner of each location where products are kept before delivery to purchasers; copies of contracts that allow the registrant to call on suppliers to fill orders; the name and principal residence of each salesperson who solicits on the registrant's behalf; and the name and address of each of the registrant's banks or financial institutions.

20. Many of Postscript's clients sell hundreds of products on their websites that they source from multiple suppliers. Accordingly, initial registration under Chapter 302 by Postscript's clients would be a massive undertaking that I estimate would take many person-hours of work at substantial cost.

21. Many of Postscript's clients, moreover, add and delete products, adjust prices, and make changes to sales information on a fairly regular basis. As I understand the requirements of Chapter 302, each such change could trigger the obligation to file an addendum to an already filed registration statement. Given the frequency with which clients make changes to their product mixes and promotional materials, they could well be in a position, if required to comply with Chapter 302, of having to file addenda to registration statements multiple times each year.

22. I have also reviewed Section 302.202, which requires certain disclosures to purchasers before consummation of any sales transaction. Since text messages are limited to 160 characters, it would be very difficult, if not impossible, to include full disclosures and any substantive content as part of the text messages that Postscript and Postscript's clients currently send to those who have asked to receive texts from them. To comply with Section 302.202, Postscript estimates that its clients could have to send at least one additional text message, and

often two, to set forth the required disclosures, resulting in receipt of two or three separate texts by a recipient who had previously consented to and expected to receive just one. The average Postscript client currently sends approximately 505,000 consented–to text messages per year. Having to send one or two additional text messages with required disclosures would increase the annual cost of an SMS marketing campaign for an average Postscript client by as much as $12,422.

23.    Chapter 302 as amended would not only impact Postscript's clients. It also impacts Postscript because Postscript sends text messages, albeit only with consent, to its own clients to promote Postscript's own products and services. To that extent, Postscript may be a "seller" subject to having to register in its own right. Any such registration, together with the requirement to file updating addenda, would place an extreme burden on Postscript.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 5, 2025.

Signed by: *Alexander Beller*
0364CA9F80014FE...
Alex Beller